IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JONATHAN D. SUSS          *
                          *
v.                        *    Civil Action No. WMN-09-1627
                          *
JP MORGAN CHASE BANK, N.A. *
                          *

* * * * * * * * * * * * * * *

**MEMORANDUM**

Before the Court is Defendant's motion for summary judgment. Paper No. 41. The motion is opposed, and a reply memorandum has been filed. Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that the motion should be granted.

**I. FACTUAL BACKGROUND**

This action relates to a mortgage note (the Note) executed by Plaintiff on May 17, 2005, in conjunction with his purchase of a piece of investment property. The originating lender on the Note was American Mortgage Network, Inc. (American Mortgage) and Plaintiff borrowed $110,000. The Note was secured by a Deed of Trust on the real property executed by Plaintiff on that same date.

Plaintiff, a practicing attorney, asserts that he did not read the Note or the Deed of Trust prior to signing them. Had

he read these documents, he would have discovered that he was making the following acknowledgements and promises:

> I understand that <u>the Lender may transfer this Note</u>. Lender or anyone who takes this Note by transfer and who is entitled to receive payment under this Note is called the "Note Holder."

Note ¶ 1 (emphasis added).

> I will make my monthly payments at [a specified address] <u>or at a different place if required by the Note Holder</u>.

Note ¶ 3 (emphasis added).

> If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

Note ¶ 7(c).

In addition, the Deed of Trust contained the following provision:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower [Plaintiff]. A sale might result in a change in the entity (know as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to the sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA[1] requires in connection with a notice of transfer of

---

[1] The Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 <u>et seq.</u>

>     servicing.  If the Note is sold and thereafter the
>     Loan is serviced by a Loan Servicer other than the
>     purchaser of the Note, the mortgage loan servicing
>     obligations to Borrower will remain with the Loan
>     Servicer or be transferred to a successor Loan
>     Servicer and are not assumed by the Note purchaser
>     unless otherwise provided by the Note purchaser.

Deed of Trust ¶ 20.

The Deed of Trust also would have informed Plaintiff, had he read it, that MERS [Mortgage Electronic Registration Systems, Inc.] was identified as the beneficiary under this Security Instrument." Deed of Trust at 2.  Defendant Chase Home Finance LLC (CHF) explains that MERS is an entity that tracks ownership interests in residential mortgages in an electronic database. MERS members, such as CHF and its parent, J.P. Morgan Chase Bank, N.A. (J.P. Morgan), pay a subscription fee for the processing and transfer of mortgages.  Mortgages on which MERS is named as a beneficiary may be freely transferred among MERS members and the transfers are recorded in MERS electronic database but are not publically recorded.  The database can be accessed via MERS's website.

As reflected on the MERS database, Morgan Stanley Mortgage Capital Holdings, LLC. (Morgan Stanley) became the investor on the Loan, replacing American Mortgage.  Effective August 1, 2005, the Note was made part of a mortgage pool called the "Fannie Mae Single Family," and Fannie Mae became an investor on

the note, replacing Morgan Stanley.  The servicing rights were transferred from American Mortgage to GMAC Mortgage, LLC (GMAC) and then from GMAC to J.P Morgan.  J.P. Morgan is the Master Servicer of the Note and CHF is the subservicer.  Affidavit of Thomas Reardon ¶ 12.

As part of the Fannie Mae Single Family mortgage pool, the Note's servicing rights were governed by the Fannie Mae Family Servicing Guide.  Id. ¶ 14; Def.'s Ex. 5 (Servicing Guide).  Under the terms of the Servicing Guide, Fannie Mae is not considered an "owner of record."  See Servicing Guide, Part I, § 205.09.  Furthermore, under the provisions of the Servicing Guide, where Fannie Mae is not the owner of record, no assignment was required in connection with the transfer of servicing rights to Defendant CHF.

On or about November 19, 2005, Defendant sent Plaintiff a "Notice of Assignment, Sale or Transfer of Servicing Rights" stating that the servicing of his loan was being transferred to Defendant CHF effective December 1, 2005.  This letter provided the new address to which payments were to be made and the other information required under RESPA.  It also provided a telephone number to call if the recipient had any questions related to the transfer of servicing.  After receiving this letter, Plaintiff did not call the number with any questions or to receive any

further information and proceeded to make his mortgage payments to CHF from December 2005 through January 2009.

In a letter dated December 28, 2008, Plaintiff stated that recent media reports that mortgage companies were collecting mortgage payments when they did not own the original mortgage note gave him cause for reasonable doubt as to whether Defendant was in possession of his Note.  He requested in that letter that Defendant produce for his personal inspection the original mortgage Note.  He also requested a "verified statement that confirms that [Defendant is] indeed the real party in interest and the current holder of said Note, to be simultaneously provided" at the time and place of that inspection.  Compl., Ex. 3A.  He concluded that a failure to comply with this request might result in his depositing his mortgage payments into an escrow account.

Defendant responded on January 6, 2009, by sending a copy of the Note with the words "Certified True Copy" stamped thereon.  Id., Ex. 4A.  Plaintiff replied on January 22, 2009, stating his position that the production of a copy of the Note did not satisfy his request for inspection of the original Note and reiterated his intention to place his payments in an escrow account if this request was not granted.  Id., Ex. 3B.  In the weeks that followed, Plaintiff sent several similar letters and

5

Defendant sent similar replies.  Beginning with his February 2009 payment and continuing to the present, Plaintiff stopped making his mortgage payments.  He initially represented that he was sending his mortgage payments to an escrow account but in his deposition, he acknowledged that the balance in the escrow account was zero.  Pl.'s Dep. at 59-60.

By letter dated April 4, 2009, Defendant informed Plaintiff that it considered him in default under the terms of the Note and threatened that if he failed to cure the default within 32 days, it would commence foreclosure proceedings without further notice.  Compl., Ex. 5B.  Plaintiff filed this action in the Circuit Court for Baltimore City on May 7, 2009.  The original Complaint contained a single count for "Declaratory Judgment."  Plaintiff filed an Amended Complaint on or about June 17, 2009, adding the following counts: Count II – "TRO/Preliminary & Permanent Injunctions – Specific Performance;" Count III – Tortious Interference with Contract; Count IV – Defamation by Libel; and Count V – Unjust Enrichment Due to Common Law Fraud/Money Damages; and VI – Constructive Trust.  Plaintiff also included in the Amended Complaint a request for exemplary or punitive damages.  Defendant removed the action to this Court on June 25, 2009.

After removing the action to this Court, Defendant filed a motion to dismiss. In opposing the motion, Plaintiff acknowledged that "the central issue and the primary reason that the plaintiff filed his lawsuit" was the issue of whether or not Defendant possessed the original Note. Opp'n to Mot. to Dismiss at 1. He further represented that he would "voluntarily dismiss his suit today if the defendant would simply come forward and present the original Note (with indications thereon that it was properly negotiated)." Id. On September 10, 2009, the Court granted Defendant's motion in part and denied in part, dismissing Plaintiff's Tortious Interference with Contract claim and his prayer for exemplary damages while allowing the remaining claims to proceed. In allowing those claims to go forward, the Court indicated its agreement with Plaintiff that the central and determinative issue as to each surviving cause of action was whether Defendant was in possession of the original Note. See Sept. 10, 2009, Mem. at 11-12. On September 24, 2009, Defendant answered the Amended Complaint and filed a counterclaim against Plaintiff asserting a claim for breach of the Note.

Defendant produced the original Note for Plaintiff's inspection on December 4, 2009. Plaintiff and his consultant examined the Note and MERS Record of Transfers in Defendant's

counsel's office and Plaintiff acknowledges that he found nothing to indicate that the Note was inauthentic or that any information on the Record of Transfers was inaccurate.  See Pl.'s Dep. 39-42, 159.  Despite Plaintiff's previous representations that he would dismiss this suit once shown the original Note, Plaintiff did not do so.

   Defendant has now filed a motion asking for summary judgment in its favor on its Counterclaim and for judgment in its favor on Plaintiff's remaining claims.  Defendant argues, and Plaintiff does not seriously contest, that if Defendant is the holder in due course of the Note, then Defendant was entitled to mortgage payments under the terms of the Note.  Because Plaintiff refused to make those payments, Plaintiff would be in default and Defendant would be entitled to certain remedies under the terms of the Note, including foreclosure.  Thus, Defendant would be entitled to judgment on its breach of contract claim and also on each of Plaintiff's claims as each of those claims are premised on a finding that Defendant was not the bona fide holder of the Note.  For example, Plaintiff's libel claim asserts that Defendant wrongfully publicized to credit reporting agencies that Plaintiff was in default.  If Plaintiff was in default, however, Defendant's report would not have been a false or libelous statement.

Again, Plaintiff does not challenge the conclusion that Defendant would be entitled to summary judgment in its favor on the counterclaim and against Plaintiff on the claims asserted in the Amended Complaint if Defendant is the bona fide holder of the Note. Perhaps surprised that Defendant was able to produce the original Note and having no grounds upon which to challenge its authenticity, Plaintiff now raises two entirely new arguments in his Opposition. First, Plaintiff challenges the legitimacy of MERS, arguing that it has no authority to transfer any beneficial interest in mortgage loans and that any internal transfer/assignment of a note by MERS is void. Second, Plaintiff contends that the securitization of the Note rendered it unenforceable.

In addition to these two arguments, Plaintiff makes the preliminary assertion that Defendant's motion is "premature" because discovery is incomplete. To support that assertion, Plaintiff comes forward with what is in the Court's perception an indefensible misrepresentation of the record. Plaintiff begins his memorandum with the statement, "[a]t the pre-trial conference conducted on February 2, Defendant was directed by Judge Grimm to produce documents pursuant to Plaintiff's discovery." Opp'n to Mot. for Summ. J. at 1. On February 2, Magistrate Judge Grimm held a settlement conference. During the

course of that conference, Judge Grimm indicated that he expected that Plaintiff would be serving requests for production of documents but did not order that any documents be produced. See Decl. of Michelle Manweiler ¶ 6. The Court notes that Plaintiff's Opposition is contradicted by his own affidavit. Where Plaintiff states in his Opposition that Judge Grimm directed Defendant to produce documents, in his affidavit he states, "[a]t the mediation with Chief Magistrate Judge Paul Grim (sic), the Court suggested that I file a request for documents seeking production of the relevant Pooling and Servicing Agreements which I did." Pl.'s Aff. at 2.

Plaintiff, however, did not file his document request until more than a month later, on March 10, 2010. Because discovery was to close on March 29, 2010, pursuant to this Court's amended scheduling order, see Paper Nos. 28 and 29, Plaintiff's request for documents was untimely. See Local Rule 104.2 (stating that written discovery requests must be made at a sufficiently early time to assure that they are answered before the expiration of the discovery deadline set by the Court) and Fed. R. Civ. P. 34 (setting thirty day response time for requests for documents). Defendant's counsel promptly informed Plaintiff's counsel that Defendant would not be responding because the request was untimely, and Plaintiff's counsel did not raise this as an issue

before discovery closed on March 29, 2010.  On that date, the parties filed a joint status report stating without qualification that "[d]iscovery has been completed."  Paper No. 37.

Not until almost a month after discovery closed, on April 26, 2010, did Plaintiff's counsel raise any issue with Defendant's discovery response.  On that date, Plaintiff's counsel requested that Defendant produce the pooling and servicing agreement (PSA) applicable to the Note.  Despite the close of discovery, Defendant agreed to produce the PSA upon entry of a protective order and forwarded a draft protective order to Plaintiff's counsel the very next day via email.  Plaintiff's counsel never responded to the email nor did he return Defendant's counsel's follow-up telephone calls concerning the protective order.  Manweiler Decl. ¶ 16.  Thus, to the extent Plaintiff is lacking the discovery needed to respond to Defendant's motion, the onus for that deficiency is plainly on Plaintiff and his counsel.

Turning to Plaintiff's two substantive arguments, the Court finds merit in neither.  As to Plaintiff's criticism of MERS, courts that have considered the issue have found that the system of recordation is proper and assignments made through that system are valid.  See, e.g., MERSCORP Inc. v. Romaine, 861

N.E.2d 81 (N.Y. 2006); Vawter v. Quality Loan Serv. Corp., Civ. No. 09-1585, 2010 WL 1629355 (W.D. Wash. Apr. 22, 2010); Sanchez v. U.S. Bank, N.A., Civ. No. 09-4506, 2010 WL 670632 (N.D. Cal. Feb. 22, 2010); Baisa v. Indymac Federal Bank, Civ. No. 09-1464, 2009 WL 3756682 at *4 (E.D. Cal. Nov. 6, 2009). The cases relied upon by Plaintiff on this issue are largely irrelevant or, if relevant, actually support the Defendant's position.

For example, in In re Mitchell, BK-S-07-16226-LBR, 2009 WL 1044368 (Bankr. D. Nev. Mar. 31, 2009),[2] the bankruptcy court simply held that MERS did not have standing to file motions to lift the stay in several bankruptcy actions and that MERS has no rights to payments, to servicing rights, or to property secured by the mortgages at issue. Id. at *3. Another decision relied upon by Plaintiff, Mortgage Electronic Registration Systems, Inc. v. Nebraska Dept. of Banking and Finance, 704 N.W.2d 784, 788 (Neb. 2005), held that MERS is not a "mortgage broker" subject to the regulation of Nebraska's Mortgage Bankers Registration and Licensing Act. MERS' standing or status, however, is not the issue in this action as MERS is not a party, CHF is. The remaining "authority" relied upon by Plaintiff - a

---

[2] Plaintiff cites to "In re Joshua and Stephanie Mitchell v. U.S. Bank, Case No. BK-S-07-16226, D. Nev. (2009)." Opp'n at 7. The Court assumes that it has located the decision intended by Plaintiff.

"strong dissent" in Romaine and a complaint filed in a Tennessee state court - obviously have no precedential value.[3]

The various arguments that Plaintiff advances to support his theory that the securitization rendered the Note unenforceable are also without legal support. As if to explain the lack of legal support for his position, Plaintiff observes that "[t]here has been virtually no serious judicial examination or discussion of who owns the mortgage promissory notes which collateralize mortgage backed securities." Opp'n to Mot. to Summ. J. at 12. He then proceeds to cite a decision that does address this issue, but does so in a manner apparently not to Plaintiff's liking as he characterizes the decision as a "very pro lender case." Id. (citing U.S. Bank, N.A. v. Cook, [No. 07-1544,] 2009 WL 35286 (N.D. Ill. Jan. 6, 2009)). In Cook, which was a foreclosure action, the defendant mortgagor challenged the plaintiff's status as a holder in due course of the mortgage note, raising some of the same kinds of challenges as Plaintiff raises here. The plaintiff in Cook took its interest by assignment from MERS and offered a pooling and servicing agreement as proof of the assignment. Based on the pooling and

---

[3] Plaintiff cites to one additional case, "Mortgage Electronic Registration Systems, Inc. v. Girdvainis, Sumter County, South Carolina Court of Common Pleas Case No. 2005-CP-43-0278," but failed to provide a copy of this unreported decision as required under Local Rule 105.5.a.

servicing agreement and the defendant's failure to offer any evidence to the contrary, the court found that the plaintiff was the true owner of the property and granted summary judgment for the plaintiff. Id. at *4.

Plaintiff's securitization arguments are also without factual support. Several of those arguments are based upon the premise that Plaintiff did not give his consent to the securitization. See Opp'n to Mot. for Summ. J. at 26-28 (arguing that the failure to obtain the consent of the mortgagor to subsequent securitization of the mortgage note renders the mortgage and note unenforceable and constitutes an improper conversion of the Note); 28-30 (arguing that the securitization was a "unilateral modification" without Plaintiff's consent). While Plaintiff may not have read the documents in which he explicitly gave consent to every transfer of rights under the Note, including loan servicing rights, he did give that consent. See, supra.

Throughout these arguments, Plaintiff also speculates that the Servicing Agreement contains restrictions on modification of the Note and that Defendant may have failed to comply with the terms of that Agreement. See, e.g., Opp'n at 24 (opining that Master Pooling and Servicing Agreements often contain express limitations upon alteration and modification of the mortgage);

32 (postulating that "[t]he Pooling Agreement (if it could be obtained in discovery) would very likely show that it creates restrictions upon modification of the promissory note'); 45 ("As presumed in the instant case (which is to be confirmed once discovery responses are provided) [Defendant] failed to follow [its] own securitization documents") (emphasis added in each quotation). Because the fault for Plaintiff not obtaining the Servicing Agreement during discovery falls on the Plaintiff (as explained above), he cannot now base arguments on provisions he believes that document might have contained.

Finding no merit in any of Plaintiff's claims and defenses, the Court will grant Defendant's motion. A separate order consistent with this memorandum will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED: July 9, 2010.